UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| ALISHA CARDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 2:19-cv-229-TAV-CRW |
| | ) | |
| DENIS MCDONOUGH, | ) | |
| SECRETARY OF VETERANS AFFAIRS, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

This matter is before the Court on defendant's motion for summary judgment [Doc. 20]. Plaintiff has responded [Doc. 28], and defendant has replied [Doc. 31]. Also before the Court are the parties' motion to exclude [Doc. 32] and motion to strike [Doc. 33] relating to submitted evidence. These matters are now ripe for the Court's review. *See* E.D. Tenn. L.R. 7.1(a). For the reasons explained below, defendant's motion to strike [Doc. 33] will be **DENIED**, plaintiff's motion to exclude [Doc. 32] will be **DENIED**, defendant's motion for summary judgment [Doc. 20] will be **GRANTED**, and this case will be **DISMISSED**.

## I.    Background

In her complaint, plaintiff raises claims of gender and disability discrimination, retaliation, and hostile work environment under Title VII of the Civil Rights Act of 1984 and Section 501 of the Rehabilitation Act [Doc. 1 ¶ 2].

Plaintiff is a female [Doc. 20-1, p. 8, Doc. 30, p. 1]. She has post-traumatic stress disorder ("PTSD"), depression, and anxiety, which she asserts are disabilities [Doc. 20-1, p. 9]. She was diagnosed with PTSD in June 2017 and her depression and anxiety began in mid-December 2016 [*Id.*].

Plaintiff was hired by the Department of Veterans Affairs ("VA") in November 2015 as a certified nursing assistant ("CNA") at the James H. Quillen Medical Center in Mountain Home, Tennessee [*Id.* at 12; Doc. 30, p. 1]. She remained in her position as a CNA for approximately a year before she moved to a position as a Medical Supply Tech in the Sterile Processing Services department ("SPS"), which sterilizes medical equipment [Doc. 20-1, pp. 13–14]. Her supervisor was Sharon Dennison, a female, who was the Chief of the SPS department [*Id.* at 14, 93].

**Bin Incident**

Ian Randolph, a male, was another Medical Supply Tech in the SPS [*Id.* at 28–29]. On the morning of December 7, 2016, plaintiff and another employee, Kim Edwards, were talking to Randolph [*Id.* at 29]. Randolph rode his bicycle to work and informed plaintiff and Edwards that someone was honking their horn at him during his commute, and he was "infuriated by it" [*Id.*; Doc. 30, pp. 1–2]. Randolph apparently stated that he had a knife and was ready to kill the driver, regardless of whether the driver was a "man or woman" [Doc. 20-1, pp. 29–30; Doc. 30, p. 2]. Plaintiff states that she felt very uncomfortable after Randolph's statement [Doc. 20-1, p. 32]. Approximately two-and-a-half hours later, plaintiff and Randolph were both inspecting medical equipment [*Id.* at 30, 32]. Plaintiff

2

suddenly heard a noise to her right and saw co-worker Marjorie Berry next to Randolph [*Id.*; Doc. 30, p. 2].  When she glanced over, she saw Randolph grabbing a bin and throwing it to his left, where she was standing [*Id.*].  The bin was plastic and approximately one foot long by eight inches wide and weighed approximately three pounds [Doc. 20-1, p. 32].  The bin struck plaintiff in the forehead [Doc. 30, p. 2].  Plaintiff could not locate her glasses, her head was hurting, and she realized that she was bleeding [Doc. 20-1, p. 30].  She then became dizzy, was "seeing stars," and felt faint, so she requested that co-workers assist her [*Id.*; Doc. 30, p. 2].

After hitting plaintiff with the bin, Randolph approached her and apologized [Doc. 20-1, p. 36; Doc. 30, p. 2].  However, plaintiff states that she did not believe that the incident was an accident because Randolph was angry at the time [Doc. 20-1, pp. 44–45].  Nevertheless, plaintiff admits that it was "very likely" that Randolph would have hit whoever was at her workstation [*Id.* at 49].  When asked if she believed that Randolph threw the bin at her because she is female, plaintiff responded "not necessarily because I'm a female" [*Id.* at 54].

In an affidavit, Randolph stated that, at the time of the bin incident, an employee came up behind him and slammed a plastic bin on the table beside him [Doc. 20-3, p. 22].  Randolph states that he had a flash-back to Iraq, thought there was an explosion, and grabbed the bin and threw it to his left to separate himself from the perceived danger [*Id.*].  After the bin struck plaintiff, Randolph left the area to contact his supervisor [*Id.* at 23].

After the incident, plaintiff was seen in the emergency room ("ER") by Dr. Ann Chang, who stitched up plaintiff's head [Doc. 20-1, pp. 36–37; Doc. 30, p. 2]. Plaintiff required four stitches [Doc. 20-1, p. 36]. Her glasses were broken, and she had a cut on her nose, but Dr. Chang confirmed with an x-ray that plaintiff's nose was not broken [*Id.*]. Plaintiff's husband, Adam Carden ("Adam") arrived at the ER, and asked Dr. Chang to perform a CT scan to check for a concussion, but Dr. Chang refused, simply stating that plaintiff did not have a concussion[1] [*Id.* at 36–37; Doc. 30, p. 3]. Plaintiff described the pain from her injury as "excruciating" and rated it as an 8 on a scale of 1 to 10 [Doc. 20-1, pp. 38–39]. Plaintiff states that Dr. Chang told her that she had no authority to send plaintiff home from work [*Id.* at 11; Doc. 30, p. 3]. Plaintiff denies that Dr. Chang discriminated against her because of her gender or disability but contends that Dr. Chang retaliated against her, because she was a VA employee, by not conducting a CT scan to check for a concussion [Doc. 20-1, p. 92].

While she was in the ER, Dennison and SPS Assistant Chief Jack Fillers visited plaintiff and Adam [*Id.* at 38]. Dennison permitted plaintiff to go home from work [*Id.* at 39; Doc. 30, p. 3]. Dennison also stated that this was not the first time that Randolph had an angry outburst [Doc. 20-1, p. 39; Doc. 30, p. 3].[2] Plaintiff contends that, based on their knowledge of Randolph's prior "angry outbursts," the VA should have known that

---

[1] Plaintiff states that she was later diagnosed with a concussion by an outside provider [Doc. 30, p. 3].

[2] Dennison denied telling plaintiff that Randolph had exhibited angry outbursts before and stated that there were no documented instances to support the statement [Doc. 20-3, p. 7].

4

Randolph would injure her [Doc. 20-1, p. 40]. However, plaintiff was not aware of any other VA supervisors that knew of any prior angry outbursts [*Id.* at 40–41]. Plaintiff was also not aware of any specific angry outbursts before December 7, 2016 [*Id.* at 41–42].

Plaintiff acknowledges that the VA opened an investigation into the bin incident on December 7 [*Id.* at 59–60]. When asked if there was anything she believed the VA should have done as part of its investigation that it did not do, plaintiff responded "not that I know of" [*Id.* at 62].

**Attempt to Report to Police**

On December 9, 2016, Adam transported plaintiff to the VA police station, and plaintiff informed Jerry Shelton, Chief of Police for the VA Police Department, that she would like to file a police report for assault based on the incident [*Id.* at 98–99; Doc. 30, p. 5]. Plaintiff states that Chief Shelton told her that he had already heard about the incident and had classified it as an accident and therefore, she could not file a police report [Doc. 20-1, pp. 99–100]. Plaintiff contends that Chief Shelton minimized the situation by not allowing her to file a police report [*Id.* at 101]. Chief Shelton ultimately allowed plaintiff to provide an oral statement to Officer Ernest King, but it was not an "official" statement [*Id.* at 101–02; Doc. 30, p. 5].

An investigative report from the VA Police indicates that Officer King spoke to plaintiff about the incident, but "[a]fter talking with her for a few minutes, [Officer King] learned the incident was actually no [sic] intended toward her but an accident and will be handled administratively" [Doc. 20-3, p. 93]. The report stated that plaintiff told Officer

King that she thought the incident was an accident and unintentional toward her, but she was upset and scared of Randolph [*Id.* at 94]. Officer King stated that this did not constitute assault, and he explained to plaintiff that no charges would be filed [*Id.*]. Both plaintiff and Adam deny telling Officer King that the incident was an accident [Doc. 29, p. 3; Doc. 30, p. 5].

In his affidavit, Chief Shelton states that when plaintiff visited the VA Police to file a police report, he immediately assigned an officer to take plaintiff's statement and complete a report [Doc. 20-3, p. 14]. Chief Shelton stated that, based on the facts presented by plaintiff and witnesses, the incident was an accident, and plaintiff told the reporting VA Police Officer that the incident was an accident [*Id.*].

Based on these facts, plaintiff contends that Chief Shelton discriminated against her based on her gender by not allowing her to file a police report against a male who assaulted her [Doc. 20-1, p. 106]. She believes that if she had been a male, Chief Shelton would have allowed her to file a police report [*Id.*]. Plaintiff stated that Chief Shelton did not discriminate against her based on her disabilities or retaliate against her [*Id.* at 106–07]. Plaintiff stated that she did not know whether Officer King discriminated against her because of her gender, but she is not alleging that he discriminated against her because of her disability [*Id.* at 168]. She is alleging that Officer King retaliated against her by only taking an oral statement and not allowing her to press charges against Randolph [*Id.*]. Plaintiff admits that, when she met with Officer King, she had not yet spoken to the VA's Equal Employment Opportunity ("EEO") officer [*Id.* at 168–69].

**First EEO Complaint Attempt**

On December 13, 2016, while still on medical leave, plaintiff first complained of discrimination to the VA's EEO Officer, Cynthia Stewart,[3] whom plaintiff informed that she wished to file an EEO complaint based on a hostile work environment [*Id.* at 10, 107–08; Doc. 30, p. 6]. Plaintiff asserts that Stewart discouraged her from filing an EEO complaint by telling her that one incident did not justify a hostile work environment claim [Doc. 20-1, pp. 107–08; Doc. 20-2, p. 14]. Stewart also asked plaintiff if she wished to be moved to a different department, and plaintiff responded that she did not wish to be moved, but the VA should move Randolph[4] [Doc. 30, p. 6]. Plaintiff contends that Stewart minimized the severity of the situation, and such was gender discrimination [Doc. 20-1, pp. 108–09]. Plaintiff stated that she was not alleging that Stewart discriminated against her because of her disabilities or retaliated against her [*Id.* at 110]. However, in her later declaration, plaintiff asserts that Stewart's actions were retaliatory [Doc. 30, p. 6].

**Worker's Compensation**

On December 15, 2016, plaintiff and Adam met with Mark Baumann, a VA worker's compensation representative, and plaintiff expressed that she was experiencing anxiety about returning to work [Doc. 20-1, pp. 112–13; Doc. 30, p. 7]. Baumann told plaintiff that she could seek assistance from the Employee Assistance Program ("EAP") or

---

[3] Although many of the documents refer to Stewart by her former name, Cynthia Metcalf, the Court will refer to her as Stewart for consistency.

[4] Plaintiff acknowledges that Randolph was detailed to another area when she returned to the SPS and that she and Randolph never worked in the same department again [Doc. 20-1, pp. 63–64].

an outside source for her anxiety [Doc. 20-1, pp. 113–14].  However, Baumann stated that "in all the years that he's worked there, anxiety doesn't get people off of work" [*Id.* at 113; Doc. 20-2, pp. 15–16; Doc. 30, p. 7].  Plaintiff stated that she believed Baumann was minimizing her anxiety and discouraging her from seeking worker's compensation benefits because it would have been a "burden" to him [Doc. 20-1, pp. 113–15; Doc. 30, p. 7].[5]

Plaintiff states that Baumann discriminated against her based on her gender "by minimizing the situation" and speaking to her in a manner that was "very condescending" [Doc. 20-1, pp. 117–18].  Plaintiff admitted that her union representative informed her that Baumann had spoken condescendingly to others, but plaintiff was unaware if Baumann also spoke to men in a condescending manner [*Id.* at 118].  Plaintiff stated that Baumann "possibly" discriminated against her based on her disabilities because he did not want to deal with her anxiety [*Id.* at 119].  Plaintiff also stated that she was alleging that Baumann retaliated against her, but she had not filed a complaint of discrimination at the time when she spoke to Baumann [*Id.* at 121].  However, plaintiff had already spoken to Stewart and stated that, based on her review of the investigative files, it appears that there were e-mails between Stewart and Baumann, although plaintiff could not recall whether those e-mails said anything about plaintiff contacting Stewart or whether she told Baumann that she complained of discrimination [*Id.* at 121–22].

---

[5]  Despite Baumann allegedly discouraging plaintiff from filing a worker's compensation claim based on her anxiety, she apparently submitted such claim, which was denied [Doc. 30, p. 7].

In an affidavit, Baumann denied knowledge of plaintiff's EEO activity [Doc. 20-3, p. 42]. Baumann stated that plaintiff came to his office on December 15, 2016, asking for a list of mental health providers [*Id.* at 43]. Baumann told plaintiff that the VA did not maintain a list of providers but directed her to a website listing providers. He denied trying to discourage plaintiff from filing a worker's compensation claim [*Id.*].

### Comments and Noises From SPS Co-Workers

Plaintiff returned to work from medical leave on December 21, 2016 [Doc. 30, p. 8]. That day, Edwards told plaintiff, "You know [Randolph] didn't mean to do that" [*Id.*; Doc. 20-1, pp. 138–39, 142]. Plaintiff believes that, if she had been a male, Edwards would not have made this statement [Doc. 20-1, p. 142]. On December 22, 2016, Rebecca Miller, who worked in the SPS, warned plaintiff to "watch [her] back" [*Id.* at 138–39]. Plaintiff did not ask Miller what she meant [*Id.* at 139]. Plaintiff states that Edwards and Miller discriminated against her based on her gender but denies that they discriminated against her based on her disability [*Id.* at 140, 142–43]. However, plaintiff believes that Edwards and Miller retaliated against her for her EEO activity, because Miller was friendly with Randolph [*Id.* at 140–41]. Plaintiff was not certain whether Edwards or Miller knew that plaintiff had complained of discrimination when they made these statements [*Id.* at 141, 143]. Plaintiff reported Miller's statement to either Sonya Bradley or Dennison [*Id.* at 141].

Will Cooke was a nightshift supervisor who was on medical leave at the time of the bin incident [*Id.* at 145]. Cooke and Randolph were close friends [*Id.* at 145–46]. On

9

December 21, 2016, Cooke came into the SPS and commented to plaintiff, "so you're the one [Randolph] knocked out" [*Id.* at 146; Doc. 30, p. 8]. In an affidavit, Cooke admitted to making this comment but explained that he was trying to make light of a situation that he knew little about, and, after he was informed of the severity of the situation, he apologized to plaintiff [Doc. 20-3, p. 46]. Plaintiff contends that Cooke discriminated against her because of her gender, because he would not have made this comment to her if she were male, stating "there's no way that he would have said that to another man" [Doc. 20-1, p. 163]. Plaintiff is not alleging that Cooke discriminated against her based on her disability [*Id.*]. She does believe that Cooke retaliated against her for her EEO activity by making this comment because of the investigation of Randolph, but she had not filed an EEO complaint at that point and was unaware if Cooke knew that she had complained to Stewart [*Id.* at 163–64].

Plaintiff states that she spoke to Dennison on January 10, 2017, about Cooke's and Edwards's comments [Doc. 30, p. 8]. Dennison, however, stated that the only comment she was made aware of was Cooke's comment [Doc. 20-3, p. 8]. Dennison stated that Cooke informed her that he apologized to plaintiff afterwards and had been unaware of the severity of the incident [*Id.*].

Danny Ward, Tom Cook ("Tom"), and Benny Cook ("Benny"), all males, were Medical Supply Techs in the SPS [Doc. 20-1, pp. 124–26]. Plaintiff states that, after she returned to the SPS, these men threw equipment and yelled loudly in the SPS to upset her [Doc. 20-1, p. 126]. Plaintiff states that the men never said anything directly to her, and

10

their yelling was not actual words, but just sounds [*Id.* at 127]. Plaintiff did not ask them why they were throwing equipment and yelling or ask them to stop [*Id.* at 127–28]. Plaintiff admitted that the SPS could be loud at times due to metal equipment [*Id.* at 32]. Although others were in the same work area when the men were creating the noise, plaintiff believed the noise was directed at her because it occurred "every time that [she and the men] were together" [*Id.* at 131].

In their affidavits, Ward, Tom, and Benny all indicated that they were unaware of plaintiff's EEO activity until after plaintiff's eventual transfer out of the SPS [Doc. 20-3, pp. 49, 61, 66]. They all deny yelling or making loud noises or being aware of such actions by others [*Id.* at 50, 62–63, 67].

Plaintiff stated that Ward, Tom, and Benny's actions were gender discrimination [Doc. 20-1, p. 131]. She is not alleging that Ward, Tom, or Benny discriminated against her because of her disability [*Id.* at 132]. However, she believes that Ward, Tom, and Benny were retaliating against her because she complained about their friend, Randolph [*Id.* at 128, 132]. She states that she was "pretty sure" they knew about her complaints of discrimination based on their friendship with Randolph, but she did not tell them that she had filed an EEO complaint [*Id.* at 132, 134–35].

Plaintiff states that she reported these actions to Bradley, her "lead tech," stating that she felt the men were being "very disruptive and rude" and the "extra loud noises and then yelling was towards [plaintiff]" [*Id.* at 129–30; Doc. 30, p. 9]. Plaintiff was not certain whether Bradley ever spoke to Ward, Tom, or Benny about their actions [Doc. 20-1,

11

p. 152]. However, the behavior continued until plaintiff left the SPS [*Id.* at 130]. Plaintiff states that she is not alleging that Bradley discriminated against her because of her gender or disability [*Id.* at 151]. However, she believes that Bradley retaliated against her by not informing Dennison or Fillers of the situation with these men because plaintiff had complained about Randolph [*Id.* at 151–52]. Plaintiff could not recall telling Bradley that she had complained to Stewart or anyone else at the VA about discrimination [*Id.* at 153].

Plaintiff alleges that on May 25, 2017, she complained to Dennison and Fillers about Ward, Tom, and Benny's behavior (as well as her visual contacts with Randolph, discussed in further detail below) and stated that she "needed out of the area" [Doc. 30, p. 11]. Instead of stopping these behaviors, Dennison told plaintiff that she could request a reassignment as a reasonable accommodation for her mental condition [*Id.*]. Plaintiff contends that such was discriminatory and/or retaliatory [Doc. 20-1, pp. 170–71]. Dennison denied that she knew of co-workers yelling or slamming medical equipment but acknowledges that plaintiff informed her that "walking through the doors" and "being in the same area" where the bin incident happened caused her anxiety [Doc. 20-3, p. 8].

**Employee Assistance Program**

In January 2017, plaintiff contacted Dr. Katherine Barteck, a psychologist for the EAP, for assistance with her anxiety [Doc. 20-1, pp. 146–47; Doc. 30, p. 10]. However, Dr. Barteck told plaintiff that she would need to seek assistance from an outside source because it was a work-related incident [Doc. 20-1, p. 147]. Plaintiff contends that Dr. Barteck minimized the situation by not helping her, but that Dr. Barteck's actions were

12

not "necessarily because [plaintiff is] a female" [*Id.* at 148]. Plaintiff does not believe that Dr. Barteck told her to seek outside psychological treatment because of her disability but believes that Dr. Barteck retaliated against her because she complained of discrimination to the VA [*Id.* at 149–50]. Plaintiff could not recall whether she told Dr. Barteck that she had complained to Stewart about discrimination [*Id.* at 150–51].

Dr. Barteck acknowledges that she encouraged plaintiff to seek evaluation and treatment outside of the VA to ensure partiality and the avoidance of a conflict of interest because it was foreseeable that such mental health evaluation or treatment could be used for litigation purposes [Doc. 20-3, p. 69]. Dr. Barteck stated that formal psychological assessment is beyond the scope of EAP services, and she explained the reasons for outside referral to plaintiff at the time [*Id.*].

**Randolph Discipline**

On December 12, 2016, Randolph was detailed to the position of Health Aid in Nursing Services until the fact-finding process in SPS was completed [Doc. 30-5]. This detail was extended on February 10, 2017, and again on April 11, 2017 [Doc. 30-6]. Each of the memoranda notifying Randolph of his detail and extension of detail were from Deborah Shell, the Acting Associate Director of Patient/Nursing Service [Docs. 30-5, 30-6].

In an internal memorandum, dated March 22, 2017, Dennison wrote that "Randolph's misconduct [was] exceptionally serious" and stated that his actions were within his control and intentional, but Dennison did not believe that Randolph intended to

hit plaintiff [Doc. 30-9, p. 1]. Dennison stated that she could not require plaintiff to work with Randolph in the future "after he committed such a violent, hostile, and traumatic act, which caused her bodily injury" [*Id.*]. Dennison noted that Randolph explained his actions were caused by a flash-back to Iraq, but Dennison also noted that Randolph yelled at Berry before throwing the bin, and if his reaction was based on a feeling of danger, he likely would have thrown the bin first [*Id.* at 4]. Therefore, Dennison stated that she did not find Randolph's explanation credible [*Id.*]. Dennison recommended that Randolph be terminated [Doc. 30-9].

On March 23, 2017, Dennison sent a letter to Randolph proposing that he be terminated based on the bin incident [Doc. 20-3, pp. 88–90]. The letter informed Randolph that he had a right to reply [*Id.* at 89]. Although not contained in the record, it appears that Randolph provided a reply [*See* Doc 20-3, p. 91 (referencing Randolph's oral and written replies)].

On July 7, 2017, Dean Borsos, the Medical Center Director, sent a letter to Randolph indicating that a decision had been made to suspend him for 14 days for the bin incident [Doc. 20-3, p. 91]. In this letter, Boros specifically stated that, in reaching this decision, Randolph's oral and written replies were carefully considered [*Id.*].

In an internal memorandum dated July 7, 2017, Borsos adopted much of Dennison's analysis from the March 22, 2017, memorandum, including that Randolph's actions were "within his control" and "intentional," but that he did not intend to hit plaintiff, and his

14

misconduct was "exceptionally serious" [Doc. 30-10, p. 1]. Borsos noted that Randolph returned to the SPS on June 15, 2017, after plaintiff was reassigned from the department [*Id.*]. Borsos likewise adopted Dennison's finding that Randolph's explanation about a flash-back was not credible [*Id.* at 4]. Nevertheless, Borsos stated that he was "mitigating the adverse action to a suspension," which he believed would be sufficient to deter this behavior in the future [*Id.*].

Plaintiff alleges that Borsos discriminated against her based on her gender because he declined to fire Randolph, and plaintiff believes that he would have done so if she were male [Doc. 20-1, p. 159]. When asked why she believed Borsos would have fired Randolph if she was male, plaintiff responded "I don't know" [*Id.*]. Plaintiff states that the appropriate discipline for Randolph was termination [*Id.* at 64]. Plaintiff believes that Borsos had determined to retain Randolph as an employee because he is male and arranged for Randolph to be temporarily detailed to another area until plaintiff could be removed from the SPS [Doc. 30, p. 134]. Borsos had never made any inappropriate or sexist comments to plaintiff, and, in fact, plaintiff had never spoken to Borsos [Doc. 20-1, p. 159]. Plaintiff does not believe Borsos discriminated against her because of her disability [*Id.* at 160]. However, plaintiff does believe that Borsos retaliated against her by not firing Randolph [*Id.* at 160–61]. Plaintiff states that she assumed Borsos knew about her EEO complaints when he decided to suspend Randolph, as he is the Medical Center Director, and her EEO complaint had been filed by that point [*Id.* at 161].

15

**Reassignment**

Plaintiff ultimately requested reassignment out of the SPS and to the Psychosocial Recovery and Treatment Program ("PRTP") in either the end of May 2017 or early June 2017 [Doc. 20-1, p. 180; Doc. 20-2, pp. 23–24]. Plaintiff spoke to VA Employee and Labor Relationships Specialist Cari Snyder about this request and explained the "hostile work environment" in the SPS [Doc. 20-1, pp. 180–81; Doc. 20-2, pp. 22–23]. In a June 6, 2017, e-mail, Snyder informed plaintiff that she could request a voluntary reassignment and not go through the reasonable accommodation process [Doc. 20-1, p. 188; Doc. 20-2, p. 22]. Plaintiff responded that, based on a phone conversation with Snyder, she "would like to ask for a voluntary reassignment" [Doc. 20-2, p. 22]. Plaintiff states that she preferred the voluntary reassignment route because she wanted out of the SPS as soon as possible [Doc. 20-1, p. 188]. Plaintiff explains that she sought reassignment based on the noises being made by co-workers in the SPS, which she believed were directed toward her [*Id.* at 18]. In addition, she stated that her continued visual contacts with Randolph, even though he was assigned to another area, were anxiety-provoking. She admits that her request for reassignment from the SPS was a voluntary change on her part [*Id.*]. In her later declaration, however, plaintiff denies that her reassignment was voluntary, and instead, contends that she was forced to request reassignment by the actions of others in the SPS [Doc. 30, p. 11].

On June 15, 2017, plaintiff was temporarily detailed to a position as a program support clerk in the PRTP [Doc. 20-1, pp. 16–17; Doc. 30 p. 14]. This detail became

16

permanent in August 2017, and plaintiff was satisfied with this reassignment [Doc. 20-1, pp. 17, 182]. While her new position in the PRTP resulted in a lower pay scale of GS-5, rather than GS-6, her pay increased from $36,611 to $37,225 [*Id.* at 18–19, 24]. Plaintiff has continued to receive pay increases based on performance in the PRTP [*Id.* at 24–25]. In her later declaration, however, plaintiff asserts that "[t]he SPS job had more opportunity for advancement" [Doc. 30, p. 14].

## **Continued Visual Encounters**

Plaintiff also states that, after the incident, Randolph continued to "harass" her, even though he was assigned to a different department, by entering the SPS break room and a common area outside the SPS locker rooms while plaintiff still worked in the SPS [Doc. 20-1, pp. 55–56; Doc. 30, pp. 6–7]. Plaintiff complained to Dennison about these encounters, but Randolph continued to visit those areas while plaintiff was present [Doc. 30, p. 9]. Plaintiff contends that Dennison discriminated against her based on her gender because she minimized plaintiff's complaints about Randolph [Doc. 20-1, p. 94]. When asked why she believed Dennison would have treated her differently if she was a male, plaintiff responded "I don't know" [*Id.* at 94–95]. Plaintiff denies that Dennison discriminated against her based on her disability or retaliated against her [*Id.* at 95].

However, even after her transfer to the PRTP, Randolph would walk by plaintiff's office on his way to the gym, despite instruction from Dennison to stay away from plaintiff [*Id.* at 56; Doc. 30, p. 14]. Plaintiff's new office, after her detail to the PRTP, was diagonal to the gym [Doc. 20-1, p. 71]. There were two entrances to the gym, one diagonal to

17

plaintiff's office door and another around the corner [*Id.* at 71–72]. Randolph used the entrance to the gym that was diagonal to plaintiff's office door [*Id.* at 72]. Plaintiff believes that the VA had a duty to ensure that she never saw Randolph again [*Id.* at 138].

Plaintiff estimated that she saw Randolph approximately 15 to 20 times after Dennison instructed him to stay away from plaintiff, but Randolph did not say or do anything to plaintiff during these encounters [*Id.* at 58]. Plaintiff did not tell anyone at the VA about each of the specific encounters [*Id.* at 81]. Various reports of contact filed by plaintiff and notes taken by plaintiff indicate that plaintiff visually encountered Randolph on several occasions both before and after her reassignment to the PRTP, but Randolph never spoke to plaintiff or took any actions toward her [Doc. 20-2, pp. 2–6].

Randolph stated that he has been using the VA's gym for more than 10 years, and there is only one entrance to the gym, which is diagonal to plaintiff's office [Doc. 20-3, p. 24]. He stated that he did take an alternate route to the gym, but the only entrance was diagonal from plaintiff's office [*Id.* at 24]. Randolph also stated that on several occasions, plaintiff would enter the gym, make eye contact with him, and proceed into the gym bathroom [*Id.* at 25].

Plaintiff asserts that she did not believe that Randolph would have continued to come near her if she were male [Doc. 20-1, pp. 55–56]. Plaintiff asserts that Randolph's behavior was retaliatory [*Id.* at 57]. Plaintiff contends that Randolph was retaliating against her because he was disciplined for the bin incident [*Id.* at 59]. Plaintiff stated that she had no knowledge that Randolph knew of her complaints of discrimination [*Id.*].

18

Dennison stated that on August 29, 2017, Stewart notified her that plaintiff alleged in her EEO complaint that Randolph walked past plaintiff's office twice a week [Doc. 20-3, p. 10]. Dennison immediately discussed the issue with Randolph, who told her that, if he saw plaintiff's door was open, he did not go by her door [*Id.*].

Plaintiff states that in early 2018, she learned that Randolph had been filing reports of contact when he visually encountered plaintiff in the gym [Doc. 30, pp. 16–17; Doc. 20-3, p. 10]. Plaintiff explains that she regularly used the restroom in the gym because it was closest to her office, and the toilet in her office suite was "noisy," which embarrassed plaintiff [Doc. 30, pp. 17–18]. Plaintiff later learned that Dennison had encouraged Randolph to file these reports of contact [*Id.* at 18]. Plaintiff believes that Dennison retaliated against her by encouraging Randolph to file reports of contact regarding plaintiff and not informing plaintiff of these reports [Doc. 20-1, p. 170]. Plaintiff indicates that she should have been informed about the reports because Randolph was a threat to her [*Id.* at 174]. Plaintiff acknowledged that Dennison did not take any actions against her based on Randolph's reports of contact [*Id.*].

**<u>Pohlid E-Mail</u>**

On November 6, 2017, Kathleen Pohlid, a VA attorney, e-mailed plaintiff's counsel stating that plaintiff could ask for another accommodation and which plaintiff believes was retaliation [Doc. 20-1, pp. 229–30; Doc. 20-2, p. 20; Doc. 30, p. 15]. The e-mail provided the procedures for plaintiff to follow if she contends that she has a disability and needs an accommodation to perform her job [Doc. 20-2, p. 20]. Plaintiff stated that she was not

subject to any job-related action as a result of Pohlid's e-mail because plaintiff did not request an accommodation [Doc. 20-1, p. 231].

**EEO Complaint**

On November 27, 2017, plaintiff filed a formal complaint of employment discrimination with the VA, alleging gender and disability discrimination, retaliation, and hostile work environment [Doc. 20-2, p. 25; Doc. 30, p. 16].  At some point thereafter, plaintiff filed a supplement to her discrimination charges in which she detailed, in relevant part, Dr. Chang's failure to conduct a CT scan after the incident, Stewart and Dennison asking or suggesting that plaintiff could be moved to a different department, and her visual sightings of Randolph after the incident [Doc. 20-2, pp. 26–32].  On December 28, 2017, the VA's Office of Resolution Management ("ORM") sent a letter to plaintiff's counsel indicating that several events raised in plaintiff's supplement to her complaint were related and/or inextricably intertwined with the claim in the original complaint [*Id.* at 36].  The letter set forth a summary of plaintiff's claims and stated that if the accepted claim was improperly formulated, incomplete, or incorrect, plaintiff must notify the office within 7 days of receipt of the letter [*Id.* at 37].  There is no evidence that plaintiff ever notified the ORM of any discrepancies.

## II.    Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a

motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party. *McLean v. 988011 Ontario Ltd*., 224 F.3d 797, 800 (6th Cir. 2000). As such, the moving party has the burden of conclusively showing the lack of any genuine issue of material fact. *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979). To successfully oppose a motion for summary judgment, "[t]he non-moving party . . . must present sufficient evidence from which a jury could reasonably find for h[er]." *Jones v. Muskegon Cnty*., 625 F.3d 935, 940 (6th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 252 (1986)).

In assessing discrimination, retaliation, or hostile work environment claims under Title VII or the Rehabilitation Act based on circumstantial evidence courts apply the *McDonnell Douglas*[6] framework. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007) (addressing the applicability of *McDonnell Douglas* to hostile work environment claims); *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001) (addressing the applicability of *McDonnell Douglas* to discrimination and retaliation claims under the Rehabilitation Act); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (addressing applicability of *McDonnell Douglas* to Title VII claims). *McDonnell Douglas* establishes a three-step burden-shifting framework for analyzing employment discrimination claims. *Gribcheck*, 245 F.3d at 550. First, a plaintiff must set forth a prima facie case of discrimination or retaliation. *Id.* The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If defendant carries

---

[6] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

this burden, plaintiff must then show by a preponderance of the evidence that the reasons offered by the defendant were pretext for discrimination. *Id.*

## III. Analysis

### A. Evidentiary Matters

Before turning to the merits of the motion for summary judgment, the Court must first address several evidentiary arguments raised by both parties. In her response to defendant's summary judgment motion, plaintiff contends that defendant relies upon various investigative witness statements as evidence instead of filing current declarations [Doc. 28, p. 2]. Plaintiff noted her intent to file a motion to have the Court reject these notes as inadmissible evidence [*Id.*].

In its reply brief, defendant argues that plaintiff's evidentiary objections should be overruled because she has not identified what specific statements are objectionable, the declarations were signed under oath and collected pursuant to the VA's duty to investigate under 29 C.F.R. § 1614.108, there is no requirement that "actual current Declarations" be used in support of a motion, and all of the evidence is admissible under Rules 803(6) and 803(8) [Doc. 31, pp. 15–16].

However, defendant also objects to portions of plaintiff's evidence submitted in response to the summary judgment motion [*Id.* at 16]. Specifically, defendant objects to Paragraph 29 of plaintiff's declaration stating that Bradley, Aimee Ellis, and Berry allegedly told her that they witnessed prior "outbursts" by Randolph because such testimony is barred by Rule 404(b) and is inadmissible hearsay [*Id.*]. Additionally,

22

defendant objects to the statements attached as Exhibits 2 and 4 to plaintiff's declaration because they are hearsay and unsworn [*Id.* at 16–17]. Finally, defendant objects to the statements made in Paragraphs 11 and 12 of Adam Carden's declaration ("Carden Declaration"), to the extent that they discuss events that allegedly happened at the VA, because those assertions are based on hearsay [*Id.* at 17].

On August 26, 2021, after briefing was completed on the pending summary judgment motion, plaintiff filed a motion to exclude certain documents submitted in support of defendant's summary judgment motion [Doc. 32]. Specifically, plaintiff alleges that Stewart attached several documents to her declaration, but that Stewart was not involved with the ORM investigation, is not the ORM manager, does not claim that she personally took the statements attached, and is not the actual custodian of records [*Id.* at 1–2]. Plaintiff argues that the attached statements of various employees were compiled or created pursuant to a regulatory-required VA investigation of plaintiff's EEO charges and are therefore inadmissible hearsay [*Id.* at 3]. Plaintiff further argues that Stewart's declaration does not provide adequate authentication of the attachments and none of the employees who provided statements were cross-examined about the contents [*Id.* at 4–5].

On September 1, 2021, defendant responded with a motion to strike plaintiff's motion to exclude [Doc. 33]. Defendant contends that plaintiff filed her motion to exclude without the Court's prior approval, in violation of Local Rule 7.1(d) [*Id.* at 1]. Defendant also contends that plaintiff's motion is untimely because it was filed after the deadline to respond to summary judgment expired [*Id.* at 2]. Moreover, defendant argues that

plaintiff's motion unfairly prejudices defendant because plaintiff received an unfair advantage by filing her motion after defendant's response to her objection [*Id.*].

Plaintiff responded in opposition to defendant's motion to strike, arguing that this Court routinely permits filing independent motions to strike or exclude after briefing of a defendant's summary judgment motion is complete [Doc. 34, pp. 2–4]. Plaintiff argues that sufficiently-detailed challenges to summary judgment evidence would consume all or most of the permitted response briefing pages [*Id.* at 4]. Further, plaintiff states that she provided notice of her intent to file a motion challenging the admissibility of evidence in her summary judgment response [*Id.* at 5–6].

The Court notes that, although evidence submitted at the summary judgment stage need not be in a form that is admissible at trial, the party offering the evidence must be able to show that the evidence will be offered in an admissible form at trial to defeat summary judgment. *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). Accordingly, hearsay evidence must be disregarded at the summary judgment stage. *Id.*

### 1. Defendant's Motion to Strike

The Court first addresses defendant's argument that plaintiff's motion to exclude should be stricken from the record, because it is not permitted by the Local Rules and is untimely. Defendant first asserts that plaintiff's motion to exclude was filed in contravention of Local Rule 7.1(d). That rule states that "[n]o additional briefs, affidavits, or other papers in support of or in opposition to a motion shall be filed without prior approval of the Court[.]" E.D. Tenn. L.R. 7.1(d). If the filing at issue were an additional

brief, the Court would agree that plaintiff's filing violated Local Rule 7.1(d). However, plaintiff's filing is not a "brief" or "affidavit" opposing summary judgment, but instead, is a motion to exclude specific evidence submitted in support of defendant's summary judgment motion. Accordingly, the Court declines to find that this filing is violative of Local Rule 7.1(d).

Defendant next asserts that plaintiff's motion to exclude is untimely because it was filed after the summary judgment briefing period expired. However, the Court notes that plaintiff did raise her evidentiary objections in her response brief, even if only cursorily, and expressed her intent to file a separate motion to exclude. Accordingly, the Court does not find that defendant was prejudiced by the filing of the motion to exclude, as it was on notice of plaintiff's intent to raise such evidentiary issues and was permitted to respond to these arguments both in its reply brief [Doc. 31] and in a response to plaintiff's motion to exclude (although the Court notes that defendant declined to file such a response). While the Court agrees that the most appropriate time to file the motion to exclude would have been at the time when plaintiff filed her summary judgment response brief, the Court nevertheless declines to deny the motion to exclude solely on timeliness grounds. Accordingly, defendant's motion to strike [Doc. 33] will be **DENIED**. Nevertheless, as explained *infra*, the Court will deny plaintiff's motion to exclude on the merits.

## 2. Plaintiff's Motion to Exclude

The exhibits to the Stewart Declaration consist of agency determinations and findings of fact and statements submitted by various witnesses to the VA during its

25

investigation. As discussed below, the Court finds that these exhibits are admissible despite being hearsay because the exhibits are properly authenticated business records under Federal Rule of Evidence 803(6). Accordingly, the Court will admit these exhibits and consider them to the extent that they have probative value in this matter by demonstrating the state of mind and motive of the parties; however, the Court notes that it is not bound by the agency's determinations or findings of fact.

As an initial matter, the Court finds that the exhibits are properly authenticated. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Evidence may be authenticated by testimony of a witness stating that "an item is what it is claimed to be." Fed. R. Evid. 901(b)(1). The exhibits attached to the Stewart Declaration are authenticated by the Stewart Declaration itself [Doc. 20-3]. Stewart signed the declaration under penalty of perjury and testified therein that she is an EEO Manager at the VA, where she has worked for 16 years, and that the exhibits to the declaration "are true and correct copies" of the VA's investigative file, the VA's Final Agency Decision, and the EEOC's decision [*Id.*]. The Court finds this testimony sufficient to authenticate these exhibits.

Turning to the admissibility of the exhibits, a statement is hearsay when: "(1) the declarant does not make [it] while testifying at the current trial or hearing; and (2) a party offers [it] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is inadmissible when it does not fall within a relevant

26

exception or exclusion to the hearsay rule. *See United States v. Kendrick*, 853 F.2d 492, 496 n.3 (6th Cir. 1988) ("[T]he proponent of a hearsay statement bears the burden of proving that the statement fits squarely within a hearsay exception or exclusion").

The exhibits attached to the Stewart Declaration are hearsay. First, it is undisputed that the declarants did not make the statements contained in these exhibits while testifying at the current trial or proceeding. Second, defendant relies upon these exhibits in its motion for summary judgment for the truth of the matters asserted therein [*See* Doc. 21, pp. 2–12]. Therefore, the exhibits consist of hearsay, which the Court may only consider if an exception the hearsay rule applies.

Ultimately, the Court finds that defendant has met its burden of showing that these exhibits fall within the hearsay exception provided by Rule 803(6), because they are records of regularly conducted activity. *See Kendrick*, 853 F.2d at 496 n.3. To fall within this exclusion, a record must meet the following requirements:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling . . . ; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness . . . ; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

*Id.* The Stewart Declaration states that these exhibits were made by persons with knowledge of the events and that the administrative agencies made and kept the records in the course of their regularly conducted activities [Doc. 20-3]. Further, the Stewart Declaration authenticates these documents, as stated above, and Stewart is therefore a

27

qualified witness [*Id.*].   Lastly, plaintiff has provided no evidence of a lack of trustworthiness regarding the source of the information or the method or circumstances of its preparation.   While plaintiff asserts that these documents were not created in the ordinary course of business of the Mountain Home Facility, Rule 803(6) does not require that the records be prepared by a specific business or organization, but simply that the records be created by an entity in its regular course of business.   These exhibits therefore fall within this exception as they are records of a regularly conducted activity, and the Court need not consider whether these documents also fall within the exception provided by Rule 803(8).

While the Court will not exclude these exhibits, the Court finds that the agency determinations and findings of fact are not binding on the Court and will only consider the documents to the extent that they are probative of the parties' motive or state of mind.   The Sixth Circuit "hold[s] that a district court does not err as a matter of law by categorically refusing to admit EEOC cause determinations in either bench or jury trials."   *E.E.O.C. v. Ford Motor Co.*, 98 F.3d 1341 (6th Cir. 1996).   "[W]itness statements contained in an investigative report may be considered on summary judgment not to prove their truth, but to demonstrate the state of mind and motive of" the parties.   *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007) (citation and quotations omitted).   "[A]n EEOC determination is not binding on the trier of fact in a discrimination action and, thus, has no bearing on the Court's determination on the merits of the Plaintiff's case."   *Crawford v. Muvico Theaters, Inc.*, No. 04-2720 B, 2006 WL 522391, at *1 (W.D. Tenn. Mar. 2,

28

2006) (citing *Lindsey v. Prive Corp.*, 161 F.3d 886, 894 (5th Cir. 1998)).  Thus, while excluding these exhibits is permissible, the Court finds that the hearsay rule does not require their exclusion, and the Court will consider them to the extent that they are probative in this matter.  *See Lindsey*, 161 F.3d at 894 ("EEOC determinations and findings of fact, although not binding on the trier of fact, are admissible as evidence in civil proceedings as probative of a claim of employment discrimination at issue in the civil proceedings.").  Therefore, the Court will consider these documents to the extent that they demonstrate the motive or state of mind of the parties, but the Court will not treat the findings of fact or decisions as binding.  For these reasons, plaintiff's motion to exclude [Doc. 32] will be **DENIED**.

### 3. Defendant's First Evidentiary Objection: Paragraph 29 of Plaintiff's Declaration

Turning to defendant's evidentiary objections, the Court will not consider the hearsay contained in Paragraph 29 of plaintiff's declaration [Doc. 30, p. 9].  In this paragraph, plaintiff states that Bradley, Ellis, and Berry told her that they had seen prior "outbursts" by Randolph [*Id.*].  As noted previously, a statement is hearsay when: "(1) the declarant does not make [it] while testifying at the current trial or hearing; and (2) a party offers [it] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).  There is no dispute that Bradley, Ellis, and Berry did not make these statements in the course of the current proceeding, and plaintiff clearly relies on these statements for the truth of the matter asserted.

29

Moreover, plaintiff has not shown that the statements "fit[] squarely within a hearsay exception or exclusion." *Id.* Indeed, plaintiff has pointed to no relevant exception or exclusion. While the Court will not strike these statements from the record, the Court will not consider these statements in ruling on defendant's motion for summary judgment. Because the Court finds that these statements are inadmissible hearsay, the Court need not address defendant's argument that these statements are inadmissible under Rule 404(b).

### 4. Defendant's Second Evidentiary Objection: Exhibits 2 and 4 to Plaintiff's Declaration

However, the Court will consider Exhibits 2 and 4 to plaintiff's declaration [Docs. 30-2, 30-4] because these statements are not hearsay; they are opposing party statements. *See* Fed. R. Evid. 801(d). A statement is not hearsay and is instead an opposing party statement when "[t]he statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed . . ." *Id.* In the context of Title VII claims, "[t]he relevant inquiry is whether the statement 'concerns a matter within the scope of the declarant's employment—there is no requirement that a declarant be directly involved in the adverse employment action.'" *Bradley v. Rhema-Nw. Operating LLC*, No. 16-2493, 2017 WL 4804419, at *2 (6th Cir. Oct. 3, 2017) (quoting *Back v. Nestle USA, Inc.*, 694 F.3d 571, 577 (6th Cir. 2012)).

Exhibits 2 and 4 to plaintiff's declaration are opposing party statements because these exhibits consist of statements provided by Bradley and Ellis in the scope of their employment [Docs. 30-2, 30-4]. Defendant asserts that "the statements are unsworn,"

30

"Bradley and Ellis were not management employees when their alleged statements were made," and that "the alleged statements did not concern any matter within the scope of their employment" [Doc. 31, pp. 16–17]. Although defendant cites no evidence or authority for these assertions, the Court addresses each assertion in turn [*Id.*].

First, whether the statements are unsworn is immaterial to the issue of whether the statements are opposing party statements. A statement is an opposing party statement when:

> The statement is offered against an opposing party and: (A) was made by the party in an individual or representative capacity; (B) is one the party manifested that it adopted or believed to be true; (C) was made by a person whom the party authorized to make a statement on the subject; (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or (E) was made by the party's coconspirator during and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2). The rule does not require that the statement be sworn.

Second, whether Bradley and Ellis were management employees is likewise immaterial. The rule does not require that the statements be made by "management employees" or any other particular type of employee. Rather, a party's employee or agent may make an opposing party statement if the employee or agent does so in the scope of the relationship. *See id.* In some Title VII cases involving an adverse employment decision, courts have considered statements by employees with managerial authority as evidence that the employer is responsible for the adverse employment action. *See, e.g.*, *Back v. Nestle USA, Inc.*, 694 F.3d 571, 577 (6th Cir. 2012) (considering statement by a Human Resources Director an opposing party statement). "Whether a statement qualifies as

31

nonhearsay under Rule 801(d)(2)(D), therefore, goes beyond simply determining if the declarant is a direct decision-maker with regard to the adverse employment action." *Carter v. Univ. of Toledo*, 349 F.3d 269, 275 (6th Cir. 2003). In *Back*, for example, the Sixth Circuit explained that "the question becomes whether [the Human Resource Director's] statement—that there was a plan to get rid of the three oldest employees and highest paid team leaders—concerned a matter *within the scope of his employment* as the acting Human Resources Director." *Id.* (emphasis added). Therefore, the relevant inquiry is not whether the employees were "management employees" but whether the statements were made "on a matter within the scope of that relationship." Fed. R. Evid. 801(d)(2).

"There is a critical difference between making a statement while one is an employee and having the actual or implied authority to make such a statement on behalf of your employer. The test is whether the statement concerns a matter within the scope of the agency or employment." *Jacklyn v. Schering-Plough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999). The appropriate inquiry, therefore, is whether the statements made by Bradley and Ellis in Exhibits 2 and 4 to plaintiff's declaration concern a matter within the scope of their employment. *See id.* Plaintiff asserts that these statements concern a matter within the scope of Bradley and Ellis's employment because the statements "were each made pursuant to an Agency investigation" in which Bradley and Ellis "were under a duty to co-operate" and the statements describe "situations which they observed or participated in during their employment at the VA" [Doc. 32, p. 5].

When an employee makes a statement pursuant to an investigation that the employee participates in as part of the employee's duties, the statement may concern a matter within the scope of the employment. *See Weinstein v. Siemens*, 756 F. Supp. 2d 839, 852 (E.D. Mich. 2010). In *Weinstein*, the court concluded that statements made by employees qualified as opposing party statements when the employees made the statements "as part of an investigation," the statements "were based on information the employee[s] received as a result of their scope of employment," and the employees "were duty-bound, as a part of their employment responsibilities, to give these statements." *Id.* While the party seeking to admit the statements in that case produced the defendant's "Corporate Code of Business Conduct and Ethics which authorize[d]" the employees to participate in such investigations, plaintiff has not done so in this case. *Id.* Nonetheless, plaintiff asserts that Bradley and Ellis had a duty to cooperate in making the statements [Doc. 32, p. 5]. The statements relate to the subject of the VA's investigation into the incident at issue in this case, and Bradley and Ellis made the statements the day after the alleged incident occurred [Docs. 30-2, 30-4]. Further, the statements appear to be made on forms bearing the letterhead of the VA, and the forms bear the signature of the "Assistant Chief SPS" [Docs. 30-2, 30-4]. *See* Fed. R. Evid. 801(d)(2) ("The statement must be considered but does not by itself establish . . . the existence or scope of the relationship . . ."). The Court

33

therefore finds that these statements were made on a matter within the scope of Bradley and Ellis's employment relationship and are not hearsay.[7] *See id.*

### 5. Defendant's Third Evidentiary Objection: Paragraphs 11 and 12 of Carden Declaration

Finally, the Court will limit its consideration of Paragraphs 11 and 12 of the Carden Declaration to the extent that these paragraphs describe matters about which Adam lacks personal knowledge. Defendant objects to Paragraphs 11 and 12 of the Carden Declaration on the basis that these paragraphs "discuss events that allegedly happened at the VA because those assertions are based on inadmissible hearsay statements made by Plaintiff to her husband" [Doc. 31, p. 17].

"A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. The Advisory Committee Note to Rule 602 provides that:

> This rule does not govern the situation of a witness who testifies to a hearsay statement as such, if he has personal knowledge of the making of the statement. Rules 801 and 805 would be applicable. This rule would, however, prevent him from testifying to the subject matter of the hearsay statement, as he has no personal knowledge of it.

Thus, Adam may testify as to the fact that plaintiff made a statement, but Adam may not testify as to the subject matter of plaintiff's statements because Adam would not have personal knowledge of the subject matter.

---

[7] However, the Court notes that these statements are irrelevant to its ultimate decision on summary judgment, as described *infra*.

34

Paragraphs 11 and 12 of the Carden Declaration contain statements that are based on hearsay, and Adam therefore lacks personal knowledge of the subject matter of the hearsay statements and cannot testify as to that subject matter. While the majority of these paragraphs describe Adam's observations of plaintiff, some parts of these paragraphs describe events that allegedly occurred when plaintiff was at work [Doc. 29, pp. 3–4]. In the instances where Adam is basing his declaration on statements made to him by plaintiff, he is relying on hearsay, not his personal knowledge. The statements made by plaintiff to Adam are hearsay because plaintiff did not make the statements while testifying in the current proceeding, and plaintiff now offers the statements, as recounted by Adam, to prove the truth of the matter asserted. Accordingly, the Court will limit its consideration of these paragraphs of the Carden Declaration by discounting the statements that Adam bases on hearsay rather than his personal knowledge.[8]

## B. Summary Judgment

### 1. Exhaustion of Claims

Before the Court delves into the *McDonnell Douglas* burden-shifting analysis, it must first address defendant's arguments regarding exhaustion of certain claims. Defendant contends that plaintiff has waived any claims relating to the following issues by not objecting to their exclusion from the VA's investigation: Dr. Chang's medical care, Boros's decision to suspend Randolph, plaintiff's visual sightings of Randolph before

---

[8] However, the Court notes that the majority of statements in the Carden Declaration are also contained elsewhere in the record; therefore, this exclusion has no discernable impact on the Court's summary judgment analysis.

June 15, 2017, or any suggestion that she consider transferring out of the SPS [Doc. 21, pp. 23–24]. Defendant asserts that these allegations were not addressed in the VA's final agency decision or in the EEOC's decision denying plaintiff's appeal [*Id.* at 24].

Plaintiff responds that she notified the VA and its EEO processing agents of every episode of the continuing hostile work environment as they occurred and had no control over what the VA's ORM decided to "accept" or arbitrary "reject" or treat as "background information" when processing her charges [Doc. 28, pp. 18, 24]. She also argues that the later hostile episodes flow from and are related to the earlier episodes of the continuing hostile work environment described in her EEO charges [*Id.* at 25].

Before filing a claim under the Rehabilitation Act, a plaintiff must exhaust her administrative remedies. *Smith v. U.S. Postal Serv.*, 742 F.2d 257, 262 (6th Cir. 1984). Similarly, under Title VII, the claimant must register a formal charge with the EEOC prior to filing a gender discrimination suit in federal court. 42 U.S.C. § 2000e-5(b), (e); *Weston v. Wal-Mart Stores E., Inc.*, No. 3:08-CV-177, 2008 WL 4372772, at *2–3 (E.D. Tenn. Sept. 18, 2008).

A district court's jurisdiction to hear cases arising under the Rehabilitation Act or Title VII is "limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Johnson v. Cleveland City Sch. Dist.*, 344 F. App'x 104, 109 (6th Cir. 2009) (citing *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 545 (6th Cir. 1991)). "Therefore, a plaintiff may bring suit on an uncharged claim if it was reasonably within the scope of the charge filed[,]" or if the agency discovers evidence of the

36

discrimination relating to the uncharged claim while investigating plaintiff's charge. *Id.* (citing *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998)).

The exhaustion requirement "is not meant to be overly rigid" and should not "result in the restriction of subsequent complaints based on procedural technicalities or the failure of the charges to contain the exact wording which might be required in a judicial pleading." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006) (quotation omitted). Thus, an EEOC complaint "should be liberally construed to encompass all claims reasonably expected to grow out of the charge of discrimination." *Id.* (quotation omitted).

Here, the Court declines to find that any of plaintiff's claims are unexhausted in this case. The record reflects that plaintiff filed a complaint of discrimination, alleging gender and disability discrimination and a hostile work environment [Doc. 20-2, p. 25; Doc. 30, p. 16]. She later supplemented her complaint with additional information, including allegations regarding Dr. Chang's failure to conduct a CT scan after the incident, Stewart and Dennison asking or suggesting that plaintiff transfer departments, and her visual sightings of Randolph after the incident [Doc. 20-2, pp. 26–32]. While the VA may have elected to treat some information provided by plaintiff as simply "background information," and while, perhaps the most prudent course of action would have been for plaintiff to object to the VA's framing of her claims, the Court nevertheless finds that these claims were reasonably within the scope of the charge of discrimination filed. Given the Sixth Circuit's guidance to construe an EEOC complaint liberally to encompass all claims reasonably expected to grow out of the charge of discrimination, *Randolph*, 453 F.3d at

732, the Court will treat all of plaintiff's claims as exhausted, and address the merits of these claims.

## 2. Gender and Disability Discrimination Claims

To establish a prima facie case of disability discrimination under the Rehabilitation Act, a plaintiff must show (1) that she is disabled, (2) that she otherwise qualified for the job with or without reasonable accommodation, (3) that she suffered an adverse employment action, (4) that her employer knew or had reason to know of her disability, and (5) that, following the adverse employment action, either she was replaced by a nondisabled person or her position remained open. *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007). The fifth element may be satisfied by showing that similarly situated non-protected employees were treated more favorably. *Id.* Similarly, to establish a prima facie case of sex discrimination under Title VII, a plaintiff must demonstrate that (1) she is a member of a protected group, (2) she was subjected to an adverse employment action, (3) she was qualified for the position, and (4) similarly situated non-protected employees were treated more favorably. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016).

Defendant argues that plaintiff cannot show that she was subjected to any adverse employment action because her transfer was voluntary [Doc. 21, p. 24]. Defendant contends that the Court should reject plaintiff's conclusory assertions in her declaration that she has less opportunity for advancement in the PRTP than in the SPS, because she cites no evidence to support this allegation [*Id.* at 14]. Defendant also contends that

38

plaintiff lacks evidence that she was replaced by someone outside her protected class or that similarly situated persons outside her protected class received better treatment [*Id.*].

As an initial matter, in her deposition, plaintiff indicated that the only individual that she believed "possibly" discriminated against her based on her disability was Baumann [Doc. 20-1, p. 119; *see also* Doc. 20-1, pp. 92, 94–95, 106–07, 110, 132, 140, 142–43, 149–50, 160, 163, 168 (stating that other named individuals did not discriminate against plaintiff based on her disability)]. Plaintiff indicated that the following individuals discriminated against her based on her gender: Chief Shelton, Officer King, Stewart, Baumann, Edwards, Miller, Cooke, Ward, Tom, Benny, Dr. Barteck, Dennison, Borsos, and Randolph [Doc. 20-1, pp. 55–56, 94, 106, 108–09, 117–18, 131, 142–43, 148, 159, 163, 168]. The Court will address whether plaintiff has established a prima facie case of disability or gender discrimination based on the actions of each of these individuals.

### a.     Adverse Employment Action

An adverse employment action is defined as "a materially adverse change in the terms and conditions of a plaintiff's employment." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010) (quotation and alterations omitted) (addressing a claim of gender discrimination under Title VII); *Plautz v. Potter*, 156 F. App'x 812, 817 (6th Cir. 2005) (addressing a claim of disability discrimination under the Rehabilitation Act). However, "[a] 'bruised ego' or a 'mere inconvenience or an alteration of job responsibilities' is not sufficient to constitute an adverse employment action." *Spees*, 617 F.3d at 391. A reassignment can qualify as an adverse employment action when accompanied by salary

or work hour changes, or when there is evidence that the employee received "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* (citation omitted).

The primary alleged adverse employment action in this case is plaintiff's reassignment to the PRTP. Defendant asserts that plaintiff's reassignment cannot be an adverse employment action because plaintiff requested a voluntary reassignment. However, the Court finds that a genuine issue of fact exists as to whether plaintiff voluntarily requested reassignment or was forced to request reassignment based on allegedly discriminatory conduct in the SPS. However, the Court finds that the voluntariness of plaintiff's reassignment is not material, because, even if non-voluntary, plaintiff's reassignment was not an adverse employment action.

Plaintiff does not allege that her reassignment resulted in any work hour changes, a less distinguished title, or significantly diminished material responsibilities. *See Spees*, 617 F.3d at 391. Plaintiff points to the fact that her reassignment came with a lower pay-grade of GS-5, rather than GS-6, but, given that her actual pay increased, plaintiff has not indicated how this change had any adverse effect [*See* Doc. 20-1, pp. 18–19, 24]. Finally, plaintiff contends, for the first time in her post-deposition declaration, that her position in the PRTP came with less opportunity for advancement than the position in the SPS [Doc. 30, p. 14]. But plaintiff provides no explanation or support for this conclusory assertion, and her reassignment cannot be deemed an adverse employment action based on

40

this conclusory statement alone. *See Blodgett v. FAF, Inc.*, 446 F. Supp. 3d 320, 329 (E.D. Tenn. 2020) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment" (quoting *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020))).

To the extent that plaintiff contends that actions by the other named individuals constituted an adverse employment action, the Court briefly explains why none of these incidents rise to the level of an adverse employment action. Chief Shelton and Officer King, in not allowing plaintiff to file a formal police report about the bin incident, took no actions that had any impact on plaintiff's employment. Although plaintiff claims that Stewart advised her that a single incident did not rise to the level of a hostile work environment claim for EEO purposes, plaintiff does not assert that Stewart prevented her from filing an EEO claim. Similarly, Baumann merely provided plaintiff advice about the potential success of a worker's compensation claim based on anxiety, and did not prevent plaintiff from filing such claim, as evidenced by the fact that plaintiff did submit a worker's compensation claim based on her anxiety. Additionally, Dr. Barteck's advice to plaintiff to seek outside mental health treatment was merely advice and did not impact plaintiff's terms and conditions of employment.

As to Edwards, Miller, and Cooke, these individuals all allegedly made one-time comments to plaintiff that she perceived as offensive. But "[i]solated comments are insufficient as adverse employment actions." *Gibbs v. Voith Indus. Servs. Inc.*, 60 F. Supp. 3d 780, 801 (E.D. Mich. 2014). Similarly, Ward, Tom, and Benny allegedly caused

41

excessive noise around plaintiff, but such activity does not rise to the level of a "materially adverse change" in plaintiff's conditions of employment. *See Spees*, 617 F.3d at 391. And, to the extent that plaintiff contends that Ward, Tom, and Benny's behavior led her to seek reassignment, the Court has explained *supra* why plaintiff's reassignment was not an adverse employment action.

Additionally, neither Dennison's instruction for Randolph to file reports of contact nor Randolph's filing of the reports of contact affected the terms and conditions of plaintiff's employment. Plaintiff admits that she was not subjected to any discipline as a result of the reports of contact, and, indeed, did not even know about the reports until receiving information in the course of her EEO proceedings. To the extent that plaintiff contends that the fact that she was not informed of the reports of contact was itself an adverse employment action, the Court notes that "[i]ncreased surveillance . . . do[es] not constitute a material adverse change in the terms of employment in the discrimination context[.]" *Lee v. Cleveland Clinic Foundation*, 676 F. App'x 488, 495 (6th Cir. 2017). Accordingly, the Court does not find that Randolph's reports of contact constitute an adverse employment action.

Finally, as to Borsos, to the extent that plaintiff contends that his failure to terminate Randolph's employment constitutes an adverse employment action, it is unclear how Randolph's continued employment with the VA was a materially adverse change in the terms of plaintiff's employment, particularly given the fact that, after the bin incident, plaintiff and Randolph never worked in the same department, and, although she

42

occasionally saw him walking to the gym, Randolph apparently never spoke to plaintiff again. Accordingly, the Court finds that none of the events described in plaintiff's complaint constitute an adverse employment action under Title VII or the Rehabilitation Act.

Because, even viewing the evidence in the light most favorable to plaintiff, there is no genuine issue of material fact as to whether plaintiff suffered an adverse employment action, plaintiff's gender and disability discrimination claims will be **DISMISSED**.

### b.    More Favorable Treatment

Additionally, plaintiff has not pointed to any similarly situated individuals with regard to any of her claims. Accordingly, the Court finds that plaintiff has not even attempted to establish this element of her prima facie case of gender or disability discrimination. For this alternate reason, plaintiff's gender and disability discrimination claims will be **DISMISSED**.

### 3.    Retaliation Claims

Defendant argues that plaintiff has no evidence that the persons she accuses of retaliation knew of her protected activity when they allegedly retaliated against her [Doc. 21, p. 25].

Plaintiff responds that defendant's permitting Randolph to stalk her and file "secret" written complaints about her restroom usage was "obviously retaliatory" [Doc. 28, p. 16, 23]. She points to the temporal proximity between her continued pursuit of EEO claims

43

after November 6, 2017, and Dennison's November 8, 2017, directive to Randolph to send reports of contact if he encountered plaintiff using the restroom in the gym [*Id.* at 23].

Defendant argues that plaintiff misstates the evidence regarding Randolph's reports of contact, which shows that Dennison merely asked Randolph to document any instances when he was "in the gym and [plaintiff] comes in to use the restroom" [Doc. 31, p. 7]. Dennison's request did not mention plaintiff's EEO activity, plaintiff was not subject to any adverse action as a result of the reports, and plaintiff kept similar documentation about her visual contacts with Randolph [*Id.*].

To establish a prima facie case of retaliation under the Rehabilitation Act or Title VII, plaintiff must show that that: (1) she engaged in protected activity; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (addressing retaliation claims under Title VII); *A.C. ex rel J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013) (addressing retaliation claims under the Rehabilitation Act and ADA).

### a.      Knowledge

First, the Court finds that plaintiff has not established that any of the individuals who allegedly retaliated against her were aware of her EEO activity at the time of such retaliatory conduct.  As the Northern District of Ohio succinctly stated: "[n]o awareness; no retaliatory animus or claim."  *Skinner v. Bowling Green State Univ.*, 461 F. Supp. 3d 667, 674 (N.D. Ohio 2020) (citation omitted).  Specifically, the relevant decision maker

44

must have known of plaintiff's protected activity. *Mulhall v. Ashcroft*, 287 F.3d 543, 548 (6th Cir. 2002).

The record reflects that plaintiff first engaged in EEO activity on December 13, 2016, when she contacted Stewart about filing a hostile work environment claim based on the bin incident [Doc. 20-1, pp. 10, 107–08; Doc. 30, p. 6]. Accordingly, the actions of Dr. Chang on December 7, 2016, and Chief Shelton and Officer King on December 9, 2016, cannot be retaliatory, because they occurred prior to plaintiff's first EEO activity.

Additionally, plaintiff has not shown that any other named individuals, with the exception of Stewart, Dennison, and Pohlid, knew of her EEO activity. As to Baumann, plaintiff contends that there were e-mails between him and Stewart but could not recall the contents of those e-mails [Doc. 20-1, pp. 121–22]. Plaintiff's assertion regarding unproduced e-mails is merely speculation that Baumann had some knowledge of plaintiff's complaint to Stewart, and "speculation is no substitute for evidence or proof as to the essential element of knowledge[.]" *Skinner*, 461 F. Supp. 3d at 674 (alterations omitted).

As to Edwards and Miller, plaintiff acknowledged that she was not certain whether either individual knew of her EEO complaint when they made the allegedly offensive comments [Doc. 20-1, pp. 141, 143]. Similarly, plaintiff admitted that she was unaware if Cooke knew of her complaints to Stewart prior to his comment [*Id.* at 163–64]. Plaintiff merely speculates that Ward, Tom, and Benny knew of her EEO complaints based on their friendship with Randolph [*Id.* at 132, 134–35]. And Plaintiff could not recall if she informed Bradley or Dr. Barteck that she had complained to Stewart and offered no other

45

evidence of these individuals' knowledge of plaintiff's EEO activity [*Id.* at 150–51, 153]. As to Borsos, plaintiff states that she assumes that he knew of her formal EEO complaint at the time when he decided to suspend Randolph, based on his position as Medical Center Director [*Id.* at 160–61]. Again, however, plaintiff offers no evidence beyond her own speculation that Borsos actually knew of plaintiff's EEO activity.

As to Randolph, plaintiff asserts that he was retaliating against her by walking past her office because he was disciplined for the bin incident [*Id.* at 59]. Notably, it appears that many of plaintiff's retaliation claims, described above, are premised on retaliation based on Randolph's discipline, rather than based on plaintiff's separate EEO activity. However, Randolph's investigation and discipline for the bin incident is separate from plaintiff's EEO activity. Accordingly, plaintiff has not shown that she engaged in any protected activity that resulted in Randolph's investigation and discipline, and therefore, whether these individuals knew of Randolph's discipline is irrelevant for purposes of this analysis.

Plaintiff has, however, shown that Dennison, Stewart, and potentially Pohlid knew of her EEO activity at the time when they allegedly retaliated against her. Specifically, the evidence shows that Stewart contacted Dennison about the contents of plaintiff's EEO complaint on August 29, 2017 [*Id.* at 10]. And, naturally, as the EEO officer to whom plaintiff first complained, Stewart was aware of plaintiff's EEO complaints. Moreover, plaintiff appears to at least imply that Pohlid was involved in, or had knowledge of, plaintiff's EEO mediation prior to the filing of formal EEO charges [Doc. 30, p. 15].

46

Accordingly, the Court will address whether plaintiff has established that Dennison, Stewart, or Pohlid's allegedly retaliatory conduct constitutes an adverse employment action.

###### b. Adverse Employment Action

"In contrast to Title VII's discrimination provision, the 'adverse employment action' requirement in the retaliation context is not limited to an employer's actions that solely affect the terms, conditions or status of employment, or only those acts that occur at the workplace." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 345 (6th Cir. 2008). Instead, for retaliation purposes, an adverse employment action is conduct that "would have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quotation omitted). Accordingly, "[p]laintiff's burden of establishing a materially adverse employment action is less onerous in the retaliation context[.]" *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014).

The Court first finds that, even under this more lenient standard, plaintiff has not established that Pohlid's actions were an adverse employment action. Pohlid merely e-mailed plaintiff's counsel, at some point after the EEO mediation, providing information on the process for plaintiff to follow if she needed to request a reassignment as a reasonable accommodation [Doc. 20-1, pp. 229–30; Doc. 20-2, p. 20; Doc. 30, p. 15]. Plaintiff admits that she was not subjected to any job-related action as a result of this e-mail [Doc. 20-1, p. 231]. Ultimately, Pohlid's e-mail, which merely provided general information about the reasonable accommodation process at the VA, would not have dissuaded a reasonable

47

worker from making or supporting a charge of discrimination. *See Hawkins*, 517 F.3d at 345. Pohlid's e-mail contains no implication that plaintiff was required to request an accommodation or that her employment would be affected if she did not request an accommodation. At best, Pohlid's e-mail can be construed as advising plaintiff of her ability to request a reasonable accommodation based on some of her EEO allegations, which is simply too inoffensive to be deemed an adverse employment action, even under the more lenient retaliation standard.

Next, as to Dennison, plaintiff asserts that Dennison retaliated by encouraging Randolph to file reports of contact when he encountered plaintiff [Doc. 20-1, p. 170]. But plaintiff herself admits that she was not even aware of Randolph's reports of contact until 2018, in the course of her EEO proceedings, and Dennison took no employment action against plaintiff based on Randolph's reports of contact [*Id.* at 170, 174]. The Court finds that plaintiff has not shown that such reports, of which she was not even aware, would have dissuaded a reasonable person from pursuing a discrimination complaint.

Finally, as to Stewart, plaintiff appears to allege that Stewart's advice that plaintiff could not establish a hostile work environment claim based solely on the bin incident was itself retaliatory for plaintiff's assertion that she wished to file a hostile work environment claim based on the bin incident [Doc. 30, p. 6]. The Court notes that, in her deposition, plaintiff denied that Stewart retaliated against her [Doc. 20-1, p. 110]. However, in her later declaration, plaintiff stated that this incident, which she had described in her deposition, was also retaliation [Doc. 30, p. 6]. The Sixth Circuit has held that a

48

post-deposition affidavit that directly contradicts a party's sworn deposition testimony should be stricken unless the party provides a persuasive justification for the contradiction. *Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 908 (6th Cir. 2006). It appears that plaintiff's post-deposition declaration that Stewart's actions were retaliatory directly contradicts her sworn deposition statement that Stewart did not retaliate against her, and plaintiff has provided no explanation for the contradiction. Accordingly, the Court finds that it would be appropriate to strike plaintiff's later claim that Stewart's actions were retaliatory and dismiss plaintiff's retaliation claim on this ground. Nevertheless, because Stewart's statement could dissuade a reasonable person from filing an EEO charge, the Court will address whether plaintiff has established causation.

### c. Causation

"In order to establish causation, a plaintiff must demonstrate that, 'but for' the protected activity, the employer would not have taken the adverse employment action." *Eyster v. Metro. Nashville Airport Auth.*, 479 F. Supp. 3d 706, 719 (M.D. Tenn. 2020). When "an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity . . . is significant enough to constitute evidence of a causal connection[.]" *George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020) (addressing a Title VII retaliation claim). However, temporal proximity alone is generally insufficient to establish a causal connection, and instead, "must be coupled with other indicia of retaliatory conduct." *Eyster*, 479 F. Supp. 3d at 719–20.

49

Because the Court has found that plaintiff has not established other elements of her prima facie claim of discrimination as to the other named individuals, the Court will analyze the causation element only as it relates to Stewart. There was certainly temporal proximity between plaintiff's assertion that she wished to file a hostile work environment claim and Stewart's advice that the one-time bin incident did not rise to the level of a hostile work environment, all of which apparently occurred in the same conversation. However, there is no other indicia of retaliatory intent present. *See Eyster*, 479 F. Supp. 3d at 719–20. Plaintiff provides no evidence, beyond the temporal proximity, and her own subjective belief, that Stewart's advice was intended as retaliation for plaintiff's EEO activity. And, even if Stewart's advice was erroneous, it is nonetheless not retaliatory absent such evidence. Accordingly, the Court finds that plaintiff has not established the causation element of her prima facie case of retaliation as to Stewart.

For the reasons discussed infra, the Court finds, viewing the evidence in the light most favorable to plaintiff, she has not established a genuine issue of material fact as to her prima facie case of retaliation. Accordingly, plaintiff retaliation claims will be **DISMISSED**.

### 4. Hostile Work Environment Claims

A plaintiff can establish a violation of Title VII or the Rehabilitation Act by proving that "the discrimination based on sex [or disability or retaliation] created a hostile or abusive work environment." *Williams v. General Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999); *see generally Plautz*, 156 F. App'x at 818 (discussing standard for hostile work

50

environment claim based on disability under the Rehabilitation Act); *Willey v. Slater*, 20 F. App'x 404, 406 (6th Cir. 2001) (discussing standard for retaliatory hostile work environment claim under Rehabilitation Act). To establish a hostile work environment claim, plaintiff must show that (1) she is a member of a protected class; (2) she was subject to unwelcome discriminatory or retaliatory harassment; (3) the harassment complained of was based on her gender, disability, or protected activity; (4) the harassment created a hostile work environment; and (5) there exists some basis for liability on the part of the employer. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000) (setting forth the factors for establishing a prima facie case of hostile work environment based on gender under Title VII); *Trepka v. Board of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (setting forth the factors for establishing a prima facie case of hostile work environment under the Americans With Disabilities Act ("ADA")); *Plautz*, 156 F. App'x at 818 (applying the ADA's hostile work environment prima facie factors to a claim under the Rehabilitation Act); *Willey*, 20 F. App'x at 406 (setting forth the factors for establishing a prima facie case of retaliatory hostile work environment under the Rehabilitation Act). *See also Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999) ("The elements and burden of proof [in a hostile work environment claim] are the same, regardless of the discrimination context in which the claim arises." (internal quotation marks omitted)).

As to the third element, defendant contends that there is no evidence of discriminatory animus [Doc. 21, p. 14]. Defendant notes that plaintiff allegedly developed anxiety and depression in mid-December 2016 and was diagnosed with PTSD in

June 2017, and first engaged in EEO activity on December 13, 2016; thus, her disabilities and EEO activity played no role in the bin incident or the alleged discrimination by Dr. Chang, Chief Shelton, or Officer King in early December. As to the alleged sexual harassment, plaintiff has offered no evidence that Randolph intentionally threw the bin at her, nor that he threw it at her because she is female [*Id.*]. Additionally, plaintiff largely speculates that the actions of other VA employees were taken because of her gender [*Id.* at 14–17].

First, the Court notes that the record indicates that the following individuals are female, like plaintiff: Dr. Chang, Dennison, Bradley, Stewart, Dr. Barteck, Edwards, Miller, and Pohlid. "As the Supreme Court has recognized, '[c]ourts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations,' but the inference of discrimination based on sex may become more complicated when the alleged harasser and victim are of the same sex." *Smith v. Rock-Tenn Serv., Inc.*, 813 F.3d 298, 307 (6th Cir. 2016) (quoting *Oncale v. Sundowner Offshore Serv. Inc.*, 523 U.S. 75, 80 (1998)). "[T]his Circuit allows a plaintiff alleging same-sex harassment in hostile work environment cases to establish the inference of discrimination based on sex in three ways: (1) where the harasser is making sexual advances and acting out of sexual desire; (2) where the harasser is motivated by general hostility to the presence of [wo]men in the workplace; and (3) where the plaintiff offers direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Id.* (quotations omitted).

As an initial matter, as to her claims relating to her disability, in her deposition, plaintiff expressly denied that any of these alleged same-sex harassers discriminated against her based on her disability. Indeed, even with regard to the alleged opposite-sex harassers, plaintiff only accuses Baumann of potentially discriminating against her based on her disability. Therefore, the Court's analysis will be limited to whether these individuals' (with the exception of Baumann) actions were because of plaintiff's gender.

Looking to the three ways the Sixth Circuit has set forth for establishing that harassment by same-sex individuals was gender-based, the Court finds that plaintiff has not provided any evidence inferring discrimination. First, there is no indication that any of the alleged harassers, of either gender, were making sexual advances toward plaintiff, nor has plaintiff made any such allegation. Second, plaintiff has not alleged that any of her same-sex harassers were motivated by general hostility to women in the workplace. To the contrary, plaintiff appears to assert that many of these individuals were hostile to her specifically, because of her complaints regarding the bin incident, rather than hostile to women in the workplace generally. And, as the Sixth Circuit has explained, "mere personal dislike . . . does not establish an actionable hostile work environment." *Mazur v. Wal-Mart Stores, Inc.*, 250 F. App'x 120, 129 (6th Cir. 2007). Finally, plaintiff has offered no comparative evidence of how these alleged same-sex harassers treated members of both sexes in a mixed-sex workplace. Accordingly, the Court finds that plaintiff has not established that the actions of plaintiff's alleged same-sex harassers was because of plaintiff's gender.

53

Additionally, to the extent that plaintiff asserts that these alleged same-sex harassers were motivated by her EEO activity, as the Court explained in detail *supra*, plaintiff has not shown that any of these individuals, exclude Stewart, Dennison, and Pohlid, had any knowledge of plaintiff's EEO activity. Absent such knowledge, their actions could not have been because of plaintiff's EEO activity. And, ultimately, the Court finds that plaintiff has not established that Stewart, Dennison, or Pohlid's allegedly discriminatory actions were because of her EEO activity.

Turning to plaintiff's alleged opposite-sex harassers, the Court finds that plaintiff has not met her burden of establishing that the alleged harassment was because of her gender or protected activity. The Sixth Circuit has held that "non-sexual conduct may be illegally sex-based where it evinces anti-female animus, and therefore could be found to have contributed significantly to the hostile environment.*" Waldo v. Consumers Energy Co.*, 726 F.3d 802, 815 (6th Cir. 2013) (internal quotations omitted). Thus, "any unequal treatment of an employee that would not occur but for the employee's gender [or protected activity], if sufficiently severe or pervasive, may constitute a hostile environment in violation of Title VII." *Id.* (internal quotations and alterations omitted). However, "[a] trier of fact cannot infer that harassment emanated from an anti-woman bias merely because a man directed that harassment toward a woman. Something more is required of the evidence." *Wiseman v. Whayne Supply Co.*, 359 F. Supp. 2d 579, 587 (W.D. Ky. 2004) (quotation omitted). Accordingly, the Court will address the actions of each of plaintiff's

alleged opposite-sex harassers and determine whether plaintiff has shown that such alleged harassment was because of her gender or protected activity.

As to Baumann, plaintiff primarily complains that he "discouraged" her from filing for worker's compensation by telling her that, in his experience, anxiety was rarely sufficient justification for time off work [Doc. 20-1, p. 113; Doc. 20-2, pp. 15–16; Doc. 30, p. 7]. She also contends that Baumann spoke to her condescendingly [Doc. 20-1, pp. 117–18]. But plaintiff offers no evidence, other than her subjective belief and speculation, that Baumann gave her this advice or spoke condescendingly to her because of her gender, disability, or protected activity. As to her disability, plaintiff merely indicates that Baumann "possibly" discriminated against her based on her disability by "discouraging" her from seeking worker's compensation, because it "would be a burden to him" [Doc. 20-1, pp. 113–15, 119]. Such speculation is insufficient to establish that Baumann's actions were because of plaintiff's disability. *See Jones v. City of Franklin*, 677 F. App'x 279, 282 (6th Cir. 2017) ("conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment"). Likewise, plaintiff merely offers her subjective belief that Baumann's advice and condescending tone were because of her gender. Indeed, plaintiff herself admits that her union representative informed her that Baumann had a history of speaking condescendingly to individuals, and she was not aware if that also included men [Doc. 20-1, p. 118]. Finally, as explained *supra*, plaintiff merely speculates that Baumann knew of her EEO activity at the time of their meeting.

55

Accordingly, even construing the evidence in the light most favorable to plaintiff, plaintiff has not established that Baumann's actions were based on her disability, gender, or protected activity.

Similarly, as to the comment by Cooke and the alleged noise made by Ward, Tom, and Benny, plaintiff merely speculates that these actions were because of her gender and protected activity. As to Cooke's comment, plaintiff merely asserts that "there's no way that he would have said that to another man" [Doc. 20-1, p. 163]. Additionally, plaintiff merely speculates that Cooke knew of her EEO activity, based on his friendship with Randolph. Such speculation is insufficient to establish that Cooke's comment was made because of plaintiff's gender or protected activity. *See Jones*, 677 F. App'x at 282. As to the noise allegedly made by Ward, Tom, and Benny, plaintiff merely asserts that these actions were based on her gender, highlighting the fact that these men were allegedly friends with Randolph [Doc. 20-1, p. 128, 131]. Even taking plaintiff's versions of events as true, that these men made noises, and the noises were directed at her, she nevertheless has not shown that such was because of her gender or protected activity, rather than because of personal dislike, which the Court noted previously, is not sufficient to establish a hostile work environment. *See Mazur*, 250 F. App'x at 129.

Next, as to Chief Shelton and Officer King, plaintiff complains that she was not permitted to press charges against Randolph for the bin incident. Plaintiff states that she subjectively believes that, if she had been a male, Chief Shelton would have permitted her to file a police report against Randolph [Doc. 20-1, p. 106]. Plaintiff also stated that she

56

did not know whether Officer King discriminated against her because of her gender [*Id.* at 168]. Again, such speculation alone is insufficient to establish that Chief Shelton and Officer King's denying plaintiff the ability to file a formal police report about the bin incident was because of plaintiff's gender. *See Jones*, 677 F. App'x at 282. And, as noted *supra*, plaintiff had not engaged in any protected activity when she visited the VA police.

As to Borsos, plaintiff merely asserts that he discriminated against her based on her gender by declining to fire Randolph for the bin incident, stating that she subjectively believes that Borsos would have terminated Randolph if plaintiff were male [Doc. 20-1, p. 159]. When asked to clarify this subjective belief at her deposition, plaintiff stated that she did not know why she believed Borsos would have fired Randolph if plaintiff was male [*Id.*]. Likewise, plaintiff "assumed" that Borsos knew of her EEO activity based on his position as Medical Center Activity. This, again, is insufficient to show that Borsos's decision to suspend Randolph for two weeks, rather than fire him, was based on plaintiff's gender or protected activity. *See Jones*, 677 F. App'x at 282.

Finally, as to Randolph himself, plaintiff complains about the bin incident and her visual contacts with Randolph after the bin incident. Regarding the bin incident, however, plaintiff stated that it was "very likely" that Randolph would have hit anyone who had been standing at her workstation with the bin, and she did "not necessarily" believe Randolph threw the bin in her direction because she is female [Doc. 20-1, pp. 49, 54]. Accordingly, plaintiff's own deposition testimony undermines any claim that Randolph's throwing of the bin toward plaintiff was because of plaintiff's gender. As to her continued visual

57

contacts with Randolph after the bin incident, plaintiff merely asserts that she does not believe Randolph would have continued to walk past her office en route to the gym if she were male [Doc. 20-1, pp. 55–56]. And plaintiff merely expresses her subjective belief that Randolph took these actions as retaliation. As the Court has explained, such subjective belief, without more, is insufficient to establish that an alleged harasser's actions were based on plaintiff's gender or protected activity. *See Jones*, 677 F. App'x at 282.

For these reasons, the Court finds that, viewing the evidence in the light most favorable to plaintiff, there is no genuine issue of material fact as to whether plaintiff has established that the allegedly harassing actions were because of her disability, gender, or protected activity. Plaintiff's hostile work environment claims will therefore be **DISMISSED**.

## IV. Conclusion

For the reasons set forth above, defendant's motion to strike [Doc. 33] will be **DENIED**, plaintiff's motion to exclude [Doc. 32] will be **DENIED**, defendant's motion for summary judgment [Doc. 20] will be **GRANTED**, and this case will be **DISMISSED**. A judgment order will follow.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE